IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| 1621 COIT ROAD REALTY LLC et al., § | |
| § | |
| Plaintiffs, § | |
| § | Civil Action No. 3:16-CV-3337-D |
| v. § | |
| § | |
| MIDWEST TX REALTY LLC et al., § | |
| § | |
| Defendants. § | |

MEMORANDUM OPINION
AND ORDER

In this contract dispute between the owners of healthcare facilities and their lessee, the lessee has filed an emergency motion to compel filing of "CHOW" applications by plaintiffs with the applicable state regulatory agencies, or, alternatively, to amend the court's December 12, 2016 order and for a grant of related relief. For the reasons that follow, the court denies the motion.

I

Plaintiffs[1] are the owners-lessors of eight healthcare facilities located on four properties. Defendant Midwest TX Realty LLC ("Midwest") is the lessee of these facilities. Defendants Josef Neuman ("Neuman") and Oscar Rosenberg ("Rosenberg") are managers of Midwest and guarantors of Midwest's obligations to plaintiffs.

Each of the four properties leased by plaintiffs to Midwest contains a skilled nursing

---

[1]Plaintiffs are 1621 Coit Road Realty LLC, 5601 Plum Creek Drive Realty LLC, 2301 North Oregon Street Realty LLC, and 8200 National Avenue Realty LLC.

facility and a long-term acute-care hospital. Midwest, in turn, subleases the facilities to operating companies. Three properties are located in Texas, and one is located in Oklahoma.

The contractual relationship between plaintiffs and Midwest is governed by a Master Lease. The Master Lease requires Midwest to pay rent to plaintiffs monthly. The Master Lease also obligates Midwest to continuously operate the facilities as skilled nursing facilities and long-term acute-care hospitals. Under the Master Lease, failing to pay rent or ceasing operations at the facilities are events of default. The Master Lease contains agreed remedies for default, including appointment of a manager/consultant, appointment of a receiver, or retaking possession.

Midwest ceased operations at two of the long-term acute-care facilities in October 2016. It failed to pay a portion of its November rent, as required by the Master Lease, attributing the shortfall to the two closed facilities. Plaintiffs then filed the instant lawsuit, seeking (i) a temporary restraining order ("TRO") that restrained Midwest from ceasing operations at any other facilities, (ii) appointment of a manager/consultant to manage all facilities subject to the Master Lease, and (iii) a constructive trust on any monies received by Midwest from operation of properties subject to the Master Lease.

The court granted a TRO restraining defendants from ceasing operations at any other facilities, and carried (i.e., deferred a decision on) the other requests for relief pending a ruling on plaintiffs' motion for a preliminary injunction. Despite the entry of the TRO, Midwest closed a third facility, citing a loss of pharmacy service, and informed the court by letter of its decision. In the same letter to the court, Midwest also stated that it expected to

imminently discharge the patients at a fourth facility, due to payroll and vendor payment shortfalls.

Soon after these developments, plaintiffs, *inter alia*, renewed their motion for appointment of a manager/consultant. The court appointed Benchmark Healthcare Consultants, LLC ("Benchmark") as a manager/consultant, with authority to

> (i) assist Midwest in curing any breaches under the Master Lease, (ii) assist Midwest in maintaining and preserving the operation of the businesses and the value of the assets located at the Property (as defined in the Master Lease), and (iii) carry out all functions as a manager of the Property, including, but not limited to, the authority to access the books and records related to the Property (including all billing, payroll, vendor, resident, and other information related to the operation of the businesses on the Property) as well as the right to control the finances, bank accounts, and other assets related to the Property, to obtain full cooperation from Midwest related to operation of the Property, to enter into, terminate, and amend contracts for services rendered to the facilities and residents, and to manage and receive all revenues, earnings, income, products, and profits from the operation of the Property.

Dec. 12, 2016 Order 2. Once appointed as manager/consultant, Benchmark took action to continue operations at the facilities. Benchmark retained the facilities' policies relating to patient care and also retained most of the employees who were already in place at the facilities. Benchmark caused the operating companies to form new contracts with vendors as needed to sustain operations at the facilities.

Midwest's secured lender—intervenor Capital Finance LLC ("Capital Finance")— terminated Midwest's credit on the day Benchmark was appointed. Plaintiffs then began funding operations at the facilities themselves. Benchmark, as manager/consultant, directed

funds to the operating companies' existing accounts so that outstanding payroll and vendor checks would clear. Benchmark later began directing funds to new accounts that were established in the names of the operating companies.

Midwest's books and records show that it currently owes Capital Finance "less than $3.9 million." Midwest Reply App. 4. Midwest's books and records also indicate that its receivables attributed to the period prior to December 13 (prior to arrival of the manager/consultant) are at least $6 million. For these reasons, Midwest maintains that Capital Finance is oversecured. Benchmark and plaintiffs have not provided a financial accounting to Midwest since the appointment of the manager/consultant, but they have agreed to provide financial statements that account for the receivables in question within 90 days after the close of the quarter to which they relate.

Midwest has counterclaimed for a declaratory judgment establishing that the Master Lease was terminated as of the date the manager/consultant entered the facilities, and for a declaratory judgment establishing that a change in ownership of the facilities had occurred. In the instant motion, Midwest asks the court to compel plaintiffs to file change of ownership ("CHOW") applications with Texas and Oklahoma regulatory agencies, or, alternatively, to expand the scope of Benchmark's appointment to make Benchmark a receiver, which Midwest contends would automatically trigger the need for CHOW applications. Midwest also moves for an accounting of all collections since December 12, 2016 that are attributable to operations of the facilities prior to Benchmark's appointment. Neuman and Rosenberg have joined Midwest's motion. Plaintiffs oppose the motion.

II

Midwest acknowledges that its motion to compel plaintiffs to file CHOW applications is the equivalent of a motion for permanent injunction. Midwest Br. 9 n.6. Were Midwest seeking a preliminary injunction, it would be required to establish each of the following: (1) a substantial likelihood that it will prevail on the merits; (2) a substantial threat that it will suffer irreparable injury if the injunction is not granted; (3) that the threatened injury to Midwest outweighs the threatened harm the injunction may do to plaintiffs; and (4) that granting the preliminary injunction will not disserve the public interest. *See, e.g., Jones v. Bush*, 122 F.Supp.2d 713, 718 (N.D. Tex. 2000) (Fitzwater, J.), *aff'd*, 244 F.3d 134 (5th Cir. 2000) (per curiam) (unpublished table decision). "Where a plaintiff seeks permanent injunctive relief, the test is the same, except that 'the movant must show actual success on the merits of the claim, rather than a mere likelihood of such success.'" *Caroline T. v. Hudson Sch. Dist.*, 915 F.2d 752, 755 (1st Cir. 1990) (quoting *K-Mart Corp. v. Oriental Plaza, Inc.*, 875 F.2d 907, 915 (1st Cir. 1989)). Midwest acknowledges that this higher burden of "actual success on the merits" applies to its motion. Midwest Br. 9 n.6. "[T]he decision whether to grant or deny injunctive relief rests within the equitable discretion of the district courts, and . . . such discretion must be exercised consistent with traditional principles of equity." *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 394 (2006).

III

A

The court considers first whether Midwest has demonstrated actual success on the merits of its counterclaim for declaratory judgment with respect to the change of ownership of the facilities. Midwest contends that it is likely to succeed on its declaratory judgment counterclaim because such an action is intended to provide an early adjudication of a controversy for which there would be no other satisfactory remedy—in the instant case, a controversy over whether a change in ownership or control has occurred. Midwest maintains that the appointment of the manager/consultant should be considered to be a change in ownership because it would be unacceptable for the States of Texas and Oklahoma to have no recourse over the entity that actually operates a healthcare facility.

Midwest also supports its merits contention with the argument that Texas law requires a license to operate an assisted living facility, and the license is not transferable. *See* 40 Tex. Admin. Code §§ 19.201, 19.210(a) (2012). Midwest therefore maintains that a transfer in ownership or control of a facility must be accompanied by a CHOW application if it is to comply with Texas healthcare law, *see id.* § 19.210(a)(5)(C) (2012), and that Oklahoma law is effectively similar.

Defendants Neuman and Rosenberg also separately argue that the manager/consultant has exceeded its contractual authority and is therefore more like a new owner or a receiver than a mere manager. Neuman and Rosenberg maintain that the Master Lease contemplates a manager/consultant with authority only to assist Midwest in curing breaches of the Master

Lease and receive certain funds. They argue that broader powers fall under the receiver remedy that is separately enumerated in the Master Lease. *See* Master Lease § 20.6.

In response to Midwest's motion, plaintiffs emphasize that Midwest has not established *actual* success on the merits of its counterclaims, as required for relief that Midwest acknowledges is the equivalent of a motion for a permanent injunction. Plaintiffs contend that, not only has the court neither imposed judgment nor concluded a trial, but plaintiffs have not even answered the counterclaims or conducted any discovery; Midwest's motion is not supported by any evidence, and relies instead on unsupported assertions (although Midwest later submitted a reply appendix); Midwest cannot prevail on its counterclaims as a matter of law; only a change of ownership, not a change of management, requires CHOW applications for new licenses to be filed; and providing management services is separate from the role of owning or operating a healthcare facility. Plaintiffs also maintain that, because the manager/consultant in this case has only provided management services, not owned or operated the facilities, no change of ownership applications are required. Plaintiffs agree with Midwest that Texas and Oklahoma law are substantively similar in this respect.

"A permanent injunction is generally only granted where . . . a full trial on the merits has occurred." *ITT Educ. Servs., Inc. v. Arce*, 533 F.3d 342, 347 (5th Cir. 2008); *see GE Capital Commercial, Inc. v. Wright & Wright, Inc.*, 2009 WL 5173954, at *9 (N.D. Tex. Dec. 31, 2009) (Lindsay, J.) (holding that actual success on merits cannot be shown until judgment as a matter of law is imposed or party prevails at trial). The court concludes that Midwest

has not carried its burden to demonstrate actual success on the merits, because Midwest has not obtained a judgment as a matter of law or prevailed at trial. *See ITT Educ. Servs.*, 533 F.3d at 347.

B

The court turns next to the requirement that Midwest establish a threat of irreparable injury. Midwest contends that the status quo threatens it with two forms of irreparable injury.

First, Midwest posits that it is subjected to liability for acts that it cannot control if the manager/consultant exercises authority over the facilities while Midwest holds the licenses. Midwest maintains that third-party lawsuits brought by patients or former patients could unjustly subject it to liability as long as it holds the licenses while the manager/consultant makes operational decisions.

Second, Midwest contends that it is likely to suffer irreparable injury because its licenses may be revoked due to acts or omissions of the manager/consultant, thereby injuring its goodwill and business opportunities.

Plaintiffs respond that Midwest's alleged threats of irreparable harm are too speculative to support a permanent or preliminary injunction. They maintain that the possibility that Midwest might be sued is not an irreparable harm. And they contend that "[e]ven if Midwest were sued and found liable and could establish that 'change of ownership' applications would have relieved it of that liability . . . then it still would have a complete and adequate damages remedy in the amount of any judgment against it." Ps. Br. 17 (emphasis omitted). And as to Midwest's second ground—the revocation of

licenses—plaintiffs maintain that this risk is merely speculative, and that Midwest has not presented evidence suggesting how a license revocation would irreparably harm Midwest's business interests. Plaintiffs also argue that the manager/consultant was put in place largely to preserve the licenses, which Midwest seemed prepared to forfeit by closing the facilities, and that the manager/consultant has reduced the risk of seeing the licenses revoked.

"A party seeking a permanent injunction must also plead and prove an irreparable injury for which no adequate remedy at law exists." *Dresser-Rand Co. v. Virtual Automation Inc.*, 361 F.3d 831, 847-48 (5th Cir. 2004). "Speculative injury is not sufficient; there must be more than an unfounded fear on the part of the applicant." *Holland Am. Ins. Co. v. Succession of Roy*, 777 F.2d 992, 997 (5th Cir. 1985). The court concludes that Midwest has not established that it is likely to suffer irreparable injury in the absence of an injunction, because threats to Midwest from third-party lawsuits are likely to be compensable by damages, and threats from revocation of the licenses have not been established beyond speculation.

C

The court now turns to the balance between the threatened injury to Midwest and the possible injury to plaintiffs from granting an injunction.

Midwest contends that, as the case now stands, the risks of injury are unfairly distributed, because plaintiffs receive the benefits of operating the facilities but shoulder none of the burdens, considering that all regulatory and third-party litigation risks reside with the party holding the licenses. Midwest posits that the relief requested in its motion would

better balance the hardships.

Plaintiffs respond that the balance of equities weighs against granting Midwest's motion. They maintain that they currently bear the burden of financing operations at the facilities, in addition to settling past-due bills associated with the time before the appointment of the manager/consultant. Plaintiffs also contend that they are in contact with potential new sublessors who are interesting in taking over operation of the facilities, and that, if they are ordered to file CHOW applications, the regulatory uncertainty would interfere with their efforts to find a long-term solution for the facilities.

The court concludes that Midwest has not met its burden to establish that the threatened injury to Midwest outweighs the threatened harm that granting the motion may do to plaintiffs. Midwest's threatened injury remains speculative and not established by evidence, and thus cannot be determined to outweigh potential harms to the plaintiffs. *See supra* § III(B).

### D

The court now considers whether Midwest has shown that granting its motion will not disserve the public interest.

Midwest contends that public policy favors the relief it seeks because state regulatory regimes require the operators of healthcare facilities to be licensed, and the licenses must be reapplied for when a transfer of ownership occurs. It also maintains that the public policy of contract enforcement favors granting relief, because plaintiffs have overstepped the manager/consultant remedy available through the Master Lease. Midwest argues that relief

recognizing that the manager/consultant is a de facto change of ownership would not disserve the public interest.

Plaintiffs respond that the public policy of contract enforcement weighs against granting relief to Midwest. They contend that it is in the public interest to uphold contracts and to enforce a remedy to which the parties have expressly agreed; that by moving for appointment of the manager/consultant, they exercised a right to select among their contractual remedies under the Master Lease; that to grant the relief Midwest seeks would be to place plaintiffs in a situation that they did not elect, in which Midwest is declared out of possession; and that granting the relief Midwest seeks improperly abridges the rights that plaintiffs bargained for under the Master Lease.

The court concludes that Midwest has not carried its burden to establish that the relief it seeks would not disserve the public interest. The record and arguments do not establish that the manager/consultant has acted beyond the terms that Midwest agreed to under the Master Lease, and for this reason the policy of contract enforcement does not weigh in Midwest's favor. And healthcare licensing policy has not been shown to weigh in Midwest's favor because Midwest has not established under the higher permanent injunction standard that appointment of a manager/consultant should be considered a change of ownership under Texas or Oklahoma law. *See supra* § III(A).

E

Because Midwest has not established the required elements for a permanent injunction, the court concludes that Midwest is not entitled to an order compelling plaintiffs

to file CHOW applications.

IV

Midwest alternatively moves the court to amend its order appointing Benchmark as a manager/consultant and instead appoint Benchmark as a receiver. Midwest contends that Fed. R. Civ. P. 60(b)(3) permits the court to amend an order for fraud, misrepresentation, or misconduct. And Midwest appears to argue that Benchmark's conduct as manager/consultant satisfies one of the Rule 60(b)(3) criteria because Benchmark and plaintiffs have exceeded the scope of the court's December 12, 2016 order. Midwest maintains that a receivership would be preferable to the status quo and would trigger the filing of CHOW applications.

Plaintiffs respond that Rule 60(b)(3) provides for relief only in cases where it is established by clear and convincing evidence that fraud or other misconduct prevented a party from fully and fairly presenting its case. Plaintiffs maintain that Midwest has not offered evidence to support any allegation of fraud or misconduct. They contend that Midwest has not even alleged that it was prevented from fully and fairly presenting its case prior to the court's December 12, 2016 order appointing the manager/consultant.

The court concludes that Midwest is not entitled to Rule 60(b)(3) relief. *See United States v. City of New Orleans*, 731 F.3d 434, 442 (5th Cir. 2013) (holding that Rule 60(b)(3) movant must establish, by clear and convincing evidence, fraud or misconduct that prevented it from presenting its case).

V

Midwest also moves for an accounting of all collections since December 12, 2016 that are attributable to operations of the facilities prior to Benchmark's appointment. Midwest contends that its former secured lender (Capital Finance) is oversecured, and that, as a result, some accounts controlled by the manager/consultant may contain funds to which Midwest is ultimately entitled. Midwest contends that Capital Finance is oversecured by approximately $2 million, and that Midwest has not received information about these accounts. Midwest is also concerned that overpayments may have been made to Capital Finance.

Plaintiffs respond that, in accordance with the Master Lease, the manager/consultant is not obligated to provide Midwest an accounting. They contend that the only pertinent contractual obligation is for Midwest itself to maintain accurate books and records, and to make them available to plaintiffs. *See* Master Lease § 32.6. Plaintiffs also posit that Midwest is not entitled to an accounting under equitable principles. They maintain that, under Texas law, an equitable accounting is only proper "when the facts and accounts presented are so complex adequate relief may not be obtained at law." *T.F.W. Mgmt., Inc. v. Westwood Shores Prop. Owners Ass'n*, 79 S.W.3d 712, 717 (Tex. App. 2002, pet. denied). Plaintiffs also contend that, when standard discovery procedures are adequate for a party to obtain adequate relief, the party is not entitled to an accounting. *See id.* at 717-18.

The court concludes that Midwest has not shown that it is entitled to an accounting because it has not established that the accounts in this case are so complex that standard

discovery procedures would be inadequate, and has not cited any authority supporting an accounting in circumstances like those present here. *See id.*

* * *

Accordingly, for the reasons explained, Midwest's December 22, 2016 emergency motion to compel filing of CHOW applications by plaintiffs with the applicable state regulatory agencies, or, alternatively, to amend the court's December 12, 2016 order and for a grant of related relief is denied.

**SO ORDERED**.

January 18, 2017.

_____
SIDNEY A. FITZWATER
UNITED STATES DISTRICT JUDGE