**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| **1621 COIT ROAD REALTY, LLC,** | ) | |
| **5601 PLUM CREEK DRIVE REALTY, LLC,** | ) | **No.  16-cv-03337-D** |
| **2301 NORTH OREGON STREET REALTY,** | ) | |
| **LLC, and 8200 NATIONAL AVENUE** | ) | **Judge Sidney A. Fitzwater** |
| **REALTY, LLC** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| | ) | |
| **MIDWEST TX REALTY, LLC,** | ) | |
| **JOSEF NEUMAN, OSCAR ROSENBERG** | ) | |
| | ) | |
| **Defendants.** | ) | |

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF THEIR EMERGENCY MOTION
TO ENFORCE THE COURT'S DECEMBER 12, 2016 ORDER**

The Court on December 12, 2016 appointed Benchmark Healthcare Consultants, LLC

("Benchmark") as a third-party manager for the facilities subject to the Master Lease Agreement

at issue in this case to, among other things, "control the finances, bank accounts, and other

assets" related to the facilities "and to manage and receive all revenues, earnings, income,

products, and profits from the operation of the Property."  (DE 34 at 2.)  The Court also ordered

Defendants Midwest TX Realty, LLC ("Midwest"), Josef Neuman ("Neuman"), and Oscar

Rosenberg ("Rosenberg") to provide information and cooperation necessary for Benchmark to

carry out its functions as a manager.  (*Id.*)

Midwest, Neuman, and Rosenberg have violated the Court's order.  Benchmark very

recently has been advised by a third-party consultant for the former accounts-receivable lender

for Midwest and its operating companies that Defendants have maintained previously

undisclosed bank accounts and have been concealing assets and collecting revenues of the

facilities in these accounts.  This conduct directly violates the Court's order giving Benchmark the right to control these accounts and requiring Defendants to cooperate with Benchmark and provide Benchmark with information about such accounts.[1]

Benchmark has demanded of Defendants information about, access to, and control of these newly identified accounts, as well as any other bank accounts related to the facilities, and that any funds in such accounts or otherwise be paid over consistent with the lending agreements to which Midwest and its operating companies are parties.  Defendants have refused to fully comply with this request, agreeing to repay only part of the diverted funds and refusing to provide Benchmark with information about or access to the previously undisclosed accounts into which the funds have been flowing—and will continue to flow—absent further intervention from the Court.  Given this refusal and that accounts receivable and other payments are still being paid into these accounts, Plaintiffs seek an emergency order from the Court directing compliance with the Court's prior December 12, 2016 order through which the Court already has granted Benchmark the right to control these accounts and to receive any revenues being paid into them.

## BACKGROUND

### A.      The Court's December 12, 2016 Order

Plaintiffs are the owners of six properties in Texas and two properties in Oklahoma, four of which have been operated as skilled nursing facilities and four as long-term acute-care hospitals.  (DE 13-1 ¶ 1.)  All of the properties are subject to a Master Lease between Plaintiffs and Midwest, which is guaranteed by Defendants Neuman and Rosenberg, who are Midwest's managers and the owners and managers of eight operating companies that each subleases one of

---

[1] As explained below, this conduct also violates an Intercreditor Agreement and Blocked Deposit Accounts Agreement (among other lending documents) dictating what accounts should receive the revenues, earnings, income, products, and profits from the facilities' operations.

the facilities subject to the Master Lease from Midwest.  (DE 1 ¶ 2, 22-23 & Ex. B.)  Neuman and Rosenberg are also both principals (the CEO and President, respectively) in an organization called Concord Healthcare Group ("Concord"), which is in the business of operating skilled nursing facilities, long-term acute-care hospitals, and other healthcare facilities throughout Texas and Oklahoma.  (DE 13-1 ¶ 3.)

After Midwest had breached the Master Lease and Neuman and Rosenberg defaulted on their guaranties, Plaintiffs brought this action and sought a temporary restraining order ("TRO") and appointment of Benchmark as a manager of the facilities as provided for in Section 20.2 and 20.6 of the Master Lease.  (DE 1, 13.)  On December 6, 2016, the Court entered a TRO (DE 22), and six days later, on December 12, 2016, the Court entered an order appointing Benchmark as manager (DE 34).  Since then, the Court has converted the TRO into a preliminary injunction (*see* DE 43) and further directed that violations of the December 12, 2016 order appointing Benchmark "are punishable by contempt" (DE 42).

Under the Court's December 12, 2016 order, Benchmark was "appointed as a manager/consultant under sections 20.2 and 20.6 of the Master Lease" for several purposes. These purposes include (among others) "maintaining and preserving the operation of the businesses and the value of the assets located at the Property (as defined in the Master Lease)." (DE 34 at 2.)  To this end, the Court specifically authorized Benchmark to "carry out all functions as a manager of the Property, including, but not limited to, the authority to access the books and records related to the Property (including all billing, payroll, vendor, resident, and other information related to the operation of the businesses on the Property) as well as the right to control the finances, bank accounts, and other assets related to the Property, to obtain full cooperation from Midwest related to operation of the Property, . . . and to manage and receive all

revenues, earnings, income, products, and profits from the operation of the Property." (*Id.*)  The

Court's order further directs Midwest, Neuman, and Rosenberg to provide "such information and

cooperation as are necessary for [Benchmark] to carry out such functions." (*Id.*)

      **B.**    **Defendants' Failure to Disclose the Existence of All Bank Accounts Relating to the Facilities and Discovery of their Diversion of Assets.**

Before Benchmark's appointment, Midwest and its affiliated operating companies had

financed the healthcare facilities' operations under a revolving credit facility with Intervenor

Capital Finance, LLC secured by and to be repaid through collection of the facilities' accounts

receivable and other security. (*See* DE 15 at 3.)  In connection with this credit facility, Capital

Finance, Midwest, its affiliated operating companies, Plaintiffs, and Intervenor Banco Popular

North America (Plaintiffs' lender and the mortgagee for the properties) also entered into an

Intercreditor Agreement as of July 1, 2015. (DE 15-1.)  Under that agreement, Capital Finance

has a first and prior security interest in (among other things) all accounts receivable of and other

rights of payment to the operating companies (defined in the agreement as "Accounts"), bank

accounts (defined in the agreement as "Deposit Accounts"), and the proceeds thereof before any

"Cut-Off Time" (which here has been set at 4:10 pm est on December 12, 2016). (*See* DE 15-1

§§ 1.1, 1.3, 1.11, 2.1(a).)  As pledged by Midwest's affiliated operating companies, Banco

Popular in turn has a first and prior security interest in (among other things) "all assets" of the

operating companies (except for the collateral in which Capital Finance has priority under the

Intercreditor Agreement). (*Id.* §§ 1.1, 1.11, 1.16, 2.2(a).)

These lending agreements establish a process through which the operating companies'

accounts receivable are to be paid into specific, controlled deposit accounts.  Under the

Intercreditor Agreement, any bank accounts or other defined "Deposit Accounts" into which "the

proceeds of Accounts are deposited" were required to be subject to "deposit account control

agreements and/or deposit account instructions." (*Id.* § 2.9(a).)  In accordance with this provision, Banco Popular, Capital Finance, and Midwest's operating companies entered into a Blocked Deposit Accounts Agreement reflecting the establishment of a series of bank accounts at Banco Popular's affiliate, Popular Community Bank, for this purpose.  (Appendix ("App.") at 2 ¶ 1, 8-24.)  In order to reconcile the accounts receivable and other payments being made by third-party payors (such as Medicare, Medicaid, and other private payors) into the accounts for the rendering of goods or services at the facilities, Capital Finance engaged third party Breslin, Young & Slaughter, LLC ("BYS").  (*Id.* at 2 ¶ 2, 34 ¶ 1.)  Since its appointment, Benchmark has been coordinating with BYS in its reconciliation and analysis of the accounts.  (*Id.* at 2 ¶ 2.)

Notwithstanding the requirement that all receivables and other "Accounts" be paid into these controlled deposit accounts at Popular Community Bank, BYS very recently has identified to Benchmark several previously undisclosed *additional* bank accounts in the names of Midwest's operating companies—none of which are provided for or covered by the Blocked Deposit Accounts Agreement—but into which accounts receivable and other payments related to the businesses have been made.  (*Id.* at 3 ¶ 3, 34-35 ¶ 2.)  These accounts include—at a minimum—multiple bank accounts maintained at JPMorgan Chase Bank, N.A. (including accounts numbered *****7898 and *****6563).  (*Id.*)  In fact, just since Benchmark's appointment, Medicare alone has made payments into accounts *****7898 and *****6563 totaling at least $443,695.00 as reflected in the following table:

| Date | Amount | Payor | Facility | Bank | Acct |
|------|--------|-------|----------|------|------|
| 12/14/2016 | 9,028.61 | Medicare | Heritage Manor | Chase | *****7898 |
| 12/15/2016 | 12,286.36 | Medicare | Heritage Manor | Chase | *****7898 |
| 12/16/2016 | 2,015.52 | Medicare | Heritage Manor | Chase | *****7898 |
| 12/19/2016 | 1,319.15 | Medicare | Heritage Manor | Chase | *****7898 |
| 12/20/2016 | 85,017.97 | Medicare | Heritage Manor | Chase | *****7898 |
| 12/21/2016 | 8,317.99 | Medicare | Heritage Manor | Chase | *****7898 |
| 12/22/2016 | 19,743.69 | Medicare | Heritage Manor | Chase | *****7898 |
| 12/23/2016 | 179.62 | Medicare | Heritage Manor | Chase | *****7898 |
| 12/27/2016 | 1,707.70 | Medicare | Heritage Manor | Chase | *****7898 |
| 1/17/2017 | 2,388.11 | Medicare | Heritage Manor | Chase | *****7898 |
| 1/19/2017 | 288.07 | Medicare | Heritage Manor | Chase | *****7898 |
| 1/20/2017 | 767.59 | Medicare | Heritage Manor | Chase | *****7898 |
| 1/24/2017 | 86,760.36 | Medicare | Heritage Manor | Chase | *****7898 |
| 1/25/2017 | 19,832.01 | Medicare | Heritage Manor | Chase | *****7898 |
| 1/26/2017 | 3,257.40 | Medicare | Heritage Manor | Chase | *****7898 |
| 12/21/2016 | 87,524.14 | Medicare | Mesa Hills | Chase | *****6563 |
| 12/22/2016 | 2,850.06 | Medicare | Mesa Hills | Chase | *****6563 |
| 12/23/2016 | 12,670.70 | Medicare | Mesa Hills | Chase | *****6563 |
| 1/11/2017 | 110.36 | Medicare | Mesa Hills | Chase | *****6563 |
| 1/23/2017 | 87,629.59 | Medicare | Mesa Hills | Chase | *****6563 |
| **TOTAL** | **443,695.00** | | | | |

(*Id*. at 3 ¶ 3, 34-35 ¶ 2, 38.)  *All* of these payments in the above chart reflect "Medicare receivables" arising from the operation of the facilities subject to the Master Lease (in this case the facilities commonly known as Heritage Manor and Mesa Hills) as defined in the Intercreditor Agreement.  (*Id*.)  Accordingly, these receivables should have been—but were not—paid into the controlled accounts at Popular Community Bank under the Intercreditor Agreement and Blocked Deposit Accounts Agreement.  (DE 15-1 § 2.9(a); App. at 2 ¶ 1, 8-10.)

Benchmark has continued to retain Global Healthcare FSGLLC ("Global"), which was the billing company that Midwest's operating companies had used before Benchmark's appointment and that is also retained by Midwest's affiliate (Concord) for facilities unrelated to the Master Lease.  (*See* DE 55-1 at 3 ¶ 4; App. at 3 ¶ 4, 34 ¶ 2, 35 ¶ 4.)  Following the discovery of these undisclosed payments into unauthorized accounts, BYS asked Global for an explanation

of the diversion and was advised that funds had been had been directed to the unauthorized accounts since before Global began providing services to Concord in April 2016. (App. at 35 ¶ 4.) When pressed for further information, Global informed BYS that an updated signed electronic-funds transfer ("EFT") Authorization Agreement had been sent to Medicare on January 24, 2017 and that Medicare has been directed to now deposit money into the controlled accounts at Popular Community Bank. (*Id*. at 3 ¶ 4, 35 ¶ 4.) But even if that direction has in fact been given, improper payments into these accounts will continue at least until that instruction takes effect—which is not expected to occur for 30 to 45 days. (*Id*. at 3 ¶ 4.) As a result, tens of thousands, if not hundreds of thousands of dollars, are likely to continue to be paid incorrectly and improperly into these accounts in the coming weeks. (*Id*.)

### C.      Defendants' Violation of the Court's December 12, 2016 Order.

Immediately after learning of the existence of these undisclosed accounts, Benchmark on January 27, 2017 demanded that Midwest provide it with access to these accounts and any other accounts related to the facilities. (*Id*. at 4 ¶ 5.) After being told the following business day that it was unnecessary for Benchmark to have that access, Benchmark reiterated its request through a formal demand letter sent that afternoon. (*Id*. at 4 ¶ 5, 26.) Benchmark at that time advised Midwest and Defendants Neuman and Rosenberg (who were copied on Benchmark's letter) to provide "the following by 5:00 est on January 31, 2017: (1) a complete list of all Deposit Accounts (as defined in the Intercreditor Agreement), and any other bank accounts related to the facilities subject to the Master Lease, for any period from March 1, 2015 to the present, (2) for each listed account, the bank name, account number, and contact person at the bank, and (3) immediate access to and control over these accounts and full cooperation in obtaining that access and control as provided for in the Court's [December 12, 2016] order." (*Id*. at 26.) Separately, that same day BYS made a request (with which Benchmark concurred) for "any

funds at any financial institution or otherwise" related to the facilities subject to the Master Lease—including any funds currently on deposit in any Chase bank accounts—to "immediately be wired to the respective Payment Account at Popular Community Bank" where the funds should have been deposited and held in the first instance. (*Id*. at 4 ¶ 6, 31.)

To date, neither Midwest nor Defendants Neuman or Rosenberg has fully complied with these requests. (*Id*. at 5 ¶ 7.) Despite a promise from Midwest's counsel to respond to Benchmark's letter on Wednesday, February 1, 2017, Benchmark to date has not been given the information requested in its January 30, 2017 letter—such as the requested list of Deposit Accounts and contact information—or the requested access, control, or cooperation with respect to these accounts, including the Chase accounts specifically identified by BYS. (*Id*.) And as for BYS's request, the Director of Budgeting for Concord (Midwest's affiliate) has replied that only $199,473.30 of the $443,695.00 in funds known to be diverted into the *****7898 and *****6563 Chase accounts will be remitted to the Popular Community Bank accounts where the funds should have gone originally. (*Id*. at 5 ¶ 7, 35, ¶ 3, 28-30, 41-42.) No explanation has been given for this decision, beyond the Budgeting Director's unelaborated—and obviously false—statement that "[t]he rest is Concord only. There were a few small deposits." (*Id*. at 40.) As explained above, none of this money could be "Concord only," since it all relates to Medicare payments for operations at the facilities subject to the Master Lease, and the difference between the $199,473.30 that has been returned and the $443,695.00 currently known to have been diverted is far more than "a few small deposits."

## ARGUMENT

There is no dispute that the Court has broad power to enforce its own orders. *E.g.*, *Futurewei Techs. Inc. v. E. Oliver Capital Grp., LLC*, No. 4:09CV455, 2012 WL 2462300, at *2 (E.D. Tex. June 27, 2012) (noting the Court's inherent power to enforce prior orders); *see also*

*Waste Mgmt. of Washington, Inc. v. Kattler*, 776 F.3d 336, 341 (5th Cir. 2015) (contempt power to remedy violations of any "definite and specific order of the court" requiring a party to act or refrain from acting); *NLRB v. Laborers' Int'l Union of N. Am., AFL–CIO*, 882 F.2d 949, 954 (5th Cir. 1989) (extending the contempt power to "any party who knowingly aids, abets, or conspires with another to evade an injunction or order of a court").  In fact, the Court here already has stated that violations of the December 12, 2016 order appointing Benchmark "are punishable by contempt" (DE 42), thereby giving Defendants ample warning that they must comply with all the terms of that order.

This order is also clear.  Under the December 12, 2016 order, Benchmark (among other things) has the authority to "access the books and records related to the Property [as defined in the Master Lease]," to "control the finances, bank accounts, and other assets related to the Property," to "receive all revenues, earnings, income, products, and profits from the operation of the Property," to "obtain full cooperation from Midwest related to operation of the Property," and to receive from Defendants Neuman and Rosenberg (along with Midwest) "such information and cooperation as are necessary for [Benchmark] to carry out such functions."  (DE 34 at 2.)

Despite this clear directive, Benchmark has *not* received access to all the books and records related to the facilities, has *not* been given control over all the bank accounts and assets related to the facilities, has *not* been receiving all revenues earnings, income, products, and profits from the operation of the facilities, and has *not* received the information and cooperation from Defendants necessary to carry out its functions.  Instead, as explained above, at some point before Benchmark's appointment, Defendants caused accounts receivable and other payments to be directed to bank accounts (such as the recently discovered accounts at Chase Bank) outside the controlled-account process established by the Intercreditor Agreement and Blocked Deposit

Accounts Agreement (among other lending documents).  Defendants then failed to disclose these accounts and payments into these accounts to Benchmark.  And since the discovery of these accounts, Defendants have refused to provide Benchmark with information about the accounts, access to the accounts, or all of the monies deposited into the accounts.

There is no dispute that the Chase accounts described above (bearing accounts number *****7898 and *****6563, among others) are "Deposit Accounts" as defined in the Intercreditor Agreement.  These accounts are in the name of Midwest's operating companies for the facilities subject to the Master Lease and have been used to "hold[] proceeds of [] Accounts" and "cash of the Operator" as those terms are defined in the Intercreditor Agreement.  (DE 15-1 § 1.12.)  The monies deposited into these accounts, including the $443,695.00 in Medicare payments described above, are unquestionably "Accounts" as defined in the Intercreditor Agreement, since those monies are attributable to specific "Medicare receivables" arising from the operation of the facilities subject to the Master Lease that BYS has identified.  (*See* App. at 3 ¶ 3, 34-35 ¶ 2, 38.)  Accordingly, these Medicare payments were required to be made into the controlled accounts at Popular Community Bank.  (DE 15-1 § 2.9(a).)  They were not, evidencing that Defendants have been diverting hundreds of thousands of dollars in assets outside the controlled-account process before Benchmark's appointment and that this diversion has continued unchecked since Benchmark's appointment.

Worse, after discovery of this unlawful diversion of assets, Defendants have refused to comply with the Court's December 12, 2016 directives to give Benchmark access to and control over these accounts.  Nor have they remitted all of the revenues improperly paid into these accounts back to the appropriate accounts at Popular Community Bank.  (App. at 4-5 ¶¶ 6-7, 28-30, 40-41.)  With respect to just the $443,695.00 in identified Medicare payments into the

*****7898 and *****6563 accounts, for example, Defendants have taken the position that only

$199,473.30 of the $443,695.00 should be returned, and to date they have provided Benchmark

with no access to or other information about these accounts.  (*Id*.)  Moreover, BYS's review is

ongoing, so it is likely that additional accounts with additional improperly diverted monies will

be discovered.  (*Id*. at 3-4 ¶ 4.)  And at a minimum, it is certain that Medicare payments will

continue to be made into the Chase accounts that have been discovered until Medicare processes

any request to change the payment instructions into these accounts—which is likely take up to 30

to 45 days—if that request has in fact been properly made.  (*Id*.)

    Given these discoveries, the Court should enter an order expressly requiring Defendants

and anyone acting in concert with Defendants, including the billing service for the healthcare

facilities subject to the Master Lease, to cooperate with Benchmark and to provide Benchmark

with information about and access to all accounts, including those specifically referred to herein.

As Plaintiffs have previously explained to the Court, Benchmark has continued to retain Global,

which was the billing company that Midwest's operating companies had used before

Benchmark's appointment and that is also retained by Midwest's affiliate (Concord) for facilities

unrelated to the Master Lease.  (DE 55-1 at 3 ¶ 4; *see* App. at 3 ¶ 4, 34-35 ¶¶ 2, 4.)  Although

Global has been providing certain information to Benchmark and BYS as part of the billing and

collection process undertaken since Benchmark's appointment, it just recently has refused

Benchmark's request for access to certain other information, including access to the financial

software required for Benchmark to create financial statements related to the facilities being

managed.   (App. at 5-6 ¶ 8.)  To the extent that Defendants' cooperation is required for

Benchmark to obtain the necessary access from Global, it should be provided, consistent with the

Court's December 12, 2016 order.

**CONCLUSION**

For the foregoing reasons, Plaintiffs request that the Court enter a specific order enforcing its December 12, 2016 order by directing Midwest, Neuman, and Rosenberg, and any party acting in concert therewith to:

(i)      provide a list, the accuracy of which is certified under oath and provided to Benchmark within two business days, identifying all Deposit Accounts (as defined in the Intercreditor Agreement between the parties to this case) and all other bank accounts related to the facilities subject to the Master Lease for any period from March 1, 2015 to the present;

(ii)     for each listed account, identify to Benchmark the bank name, account number, and contact person at the bank and provide all bank statements and other records relating to the accounts;

(iii)    for each listed account, provide Benchmark with immediate access to and control over the accounts, sign any necessary documents, and take any other steps necessary to give Benchmark access to and control over these accounts;

(iv)    certify, under oath, that no other payment directions are in effect that direct payment of cash that constitutes "assets related to the Property" (as specified in the Court's December 12, 2016 order) or that constitutes proceeds of any "revenues, earnings, income, products, and profits from the operation of the Property" (as specified in the Court's December 12, 2016 order) to accounts other than the controlled accounts at Popular Community Bank;

(v)     immediately turn over all cash that constitutes "assets related to the Property" (as specified in the Court's December 12, 2016 order) or that constitutes proceeds of all "revenues, earnings, income, products, and profits from the operation of the Property" (as specified in the Court's December 12, 2016 order) whether held in any accounts or otherwise;

(vi)     provide Benchmark with complete cooperation, including signing any necessary documents or authorizations, to allow Benchmark to access the books and records related to the Property maintained by any third party, including (but not limited to) any information or other materials possessed by Global Healthcare FSGLLC.

Dated: February 3, 2017

/s/ David C. Giles
David C. Giles

Tracey R. Wallace
twallace@schiffhardin.com
Bar Number 00797617
SCHIFF HARDIN LLP
300 Crescent Ct., Suite 400
Dallas, TX 75201
(214) 981-9900 (phone)
(214) 981-9901 (fax)

John N. Scholnick
jscholnick@schiffhardin.com
David C. Giles
dgiles@schiffhardin.com
Mir Y. Ali
mali@schiffhardin.com
*(all admitted pro hac vice)*
SCHIFF HARDIN LLP
233 S. Wacker Dr., Suite 6600
Chicago, Illinois 60606
(312) 258-5500 (phone)
(312) 258-5600 (fax)
Attorneys for Plaintiffs

## CERTIFICATE OF SERVICE

The undersigned attorney hereby certifies that on February 3, 2017, the foregoing was filed electronically with the Clerk of Court using the CM/ECF system, which constitutes service on all parties of record.


_____/s/ Mir Y. Ali_____