IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| 1621 COIT ROAD REALTY, LLC,     ) | |
| 5601 PLUM CREEK DRIVE REALTY, LLC,   ) | No.  16-cv-03337-D |
| 2301 NORTH OREGON STREET REALTY,   ) | |
| LLC, and 8200 NATIONAL AVENUE    ) | Judge Sidney A. Fitzwater |
| REALTY, LLC                            ) | |
|                                              ) | |
|       Plaintiffs,       ) | |
|                                              ) | |
| v.                                          ) | |
|                                              ) | |
| MIDWEST TX REALTY, LLC,      ) | |
| JOSEF NEUMAN, OSCAR ROSENBERG   ) | |
|                                              ) | |
|       Defendants.        ) | |

**PLAINTIFFS' MEMORANDUM IN SUPPORT
OF THEIR EMERGENCY MOTION TO COMPEL DEFENDANTS
TO COOPERATE WITH FILING OF "CHOW" APPLICATIONS**

On December 22, 2016, Defendant Midwest TX Realty, LLC ("Midwest") filed an emergency motion (DE 40) to compel Plaintiffs to file change of ownership ("CHOW") applications with the applicable state and federal regulatory agencies for eight facilities that are subject to the Master Lease Agreement between the parties in this case.  The Court denied the motion because Midwest failed to show that the Court's appointment of Benchmark Healthcare Consultants, LLC ("Benchmark") as manager for the facilities (DE 34) constituted a CHOW under any state or federal law.  (DE 63 at 11.)

Now, new operators are ready and willing to take over operations from Midwest under new leases that Plaintiffs have negotiated for seven of the eight Facilities (as that term is defined in the Master Lease).  In order to take over operations, the new operators are prepared to take all necessary action to request that operation of each of the Facilities be transferred to such new

operators.  Such action may include (1) requesting that all applicable state or federal agencies or private third parties transfer via CHOW or similar processes any existing state or federal licenses, certifications, accreditations, registrations, permits or similar approvals required to operate each of the facilities under state or federal law (collectively the "Regulatory Permits"); and (2) requesting that applicable state, federal, or private third party payor programs transfer via CHOW or similar processes any existing agreements to participate as a provider in such state, federal, or private third party payor programs as necessary to receive payment for services rendered by each of the Facilities (collectively the "Payor Agreements").

Pursuant to LR 7.1, Plaintiffs have sought Defendants' agreement to cooperate in effectuating the CHOW processes necessary to obtain such Regulatory Permits and Payor Agreements, whether via CHOW or otherwise.  While Defendants have not refused to consider agreeing with Plaintiffs and their new operators, Defendants also have not yet agreed.  Given the fact that Plaintiffs would like to have their new operators assume the "ownership" as soon as possible, and given that the CHOW process will take some time, Plaintiffs needed to file this motion right away to expedite the CHOW process.  Plaintiffs accordingly seek an order from the Court to require Defendants to cooperate with Plaintiffs, Benchmark, and the new operators to facilitate a CHOW for any necessary Regulatory Permits or Payor Agreements at each of the Facilities subject to the Master Lease, and pending regulatory approval of the CHOWs for any necessary Regulatory Permits or Payor Agreements, to cooperate in maintaining the licenses, Regulatory Permits, or Payor Agreements now in effect.  This relief will enable the Plaintiffs, Benchmark, and the new operators to continue to perform the work this Court authorized it to do under the Master Lease.

Defendants should have no principled objections to this motion. This motion seeks exactly the relief they sought six months ago. Moreover, the relief sought is in accordance with the Court's prior orders and is authorized by the Master Lease between the parties. Therefore, Court should grant the relief sought here.[1]

## BACKGROUND

A.  **Midwest's Breaches of the Master Lease**

Plaintiffs are the owners of six properties in Texas and two properties in Oklahoma, four of which are operated as skilled nursing facilities and four as long-term acute-care hospitals. (DE 13-1 ¶ 1.) All of the properties are subject to a Master Lease between Plaintiffs and Midwest, which is guaranteed by Defendants Josef Neuman and Oscar Rosenberg, who are Midwest's managers and the owners and managers of eight operating companies that each subleases one of the facilities subject to the Master Lease from Midwest. (DE 1 ¶ 2, 22-23 & Ex. B.) Neuman and Rosenberg are also both principals (the CEO and President, respectively) in an organization called Concord Healthcare Group ("Concord"), which is in the business of operating skilled nursing facilities, long-term acute-care hospitals, and other healthcare facilities throughout Texas and Oklahoma. (DE 13-1 ¶ 3.)

At least by the end of October 2016, Midwest and its affiliated operating companies had defaulted under the Master Lease. (*Id*. ¶¶ 6-8.) First, as to two of the Facilities, Midwest and its

---

[1] Because the prospective new operators are ready to begin the CHOW process immediately, Plaintiffs have noticed this motion as an emergency motion, just as Defendants previously noticed their identical prior request for relief. The new leases that Plaintiffs have signed with new operators are contingent on completion of the CHOW process, which Defendants can unjustifiably delay by insisting that this motion proceed under the normal 21-day response period provided by L.R. 7.1(e). To avoid the risk posed by such delay (including the risk of losing the lease agreements with the new operators), Plaintiffs request expedited briefing of this motion.

related operating companies on October 28, 2016 breached Sections 7.2(b) and 7.2(c) of the lease (among other provisions), which require that Midwest and the operating companies "operate continuously" the leased properties "as a provider of health care services" in accordance with their "Primary Intended Use" (defined "as skilled nursing facilities or long term acute care hospitals"). (*See* DE 13-1 ¶ 6; *see also* DE 1-1 §§ 7.2(b), 7.2(c).)

Second, on November 9, 2016, Midwest refused to pay the full amount of the "Base Rent" and "Additional Rent" due under the lease, shorting its November 2016 rent payment by $133,929.46 (and since refusing to pay any rent due for December 2016 or January through June 2017). (DE 13-1 ¶ 7.) Those failures violated Section 4.1 of the lease (among other provisions), which states that Midwest shall pay rent on the first day of each month "without demand, deduction, or offset for any reason whatsoever." (DE 1 §§ 4.1(a), (b).)

Third, on November 23, 2016, Midwest and the related operating companies announced that they intended to discharge the patients and "immediately to cease operations" at two other long-term acute-care hospitals subject to the lease (Mesa Hills Specialty Hospital and Midwest City Specialty Hospital). (DE 13-1 ¶ 9 & Ex. 5.) That conduct would have resulted in further breaches of the requirement in Sections 7.2(b) and 7.2(c) to "operate *continuously* the Leased Properties as a provider of health care services in accordance with [their] Primary Intended Use." (DE 1-1 §§ 7.2(b), 7.2(c) (emphasis added).)

**B.     The Court's Temporary Restraining Order And Appointment Of A Manager**

Because of Midwest's actual and threatened breaches, Plaintiffs filed this action and moved (among other things) for a TRO. (DE 1, 13.) The Court in part entered that TRO on December 6, 2016. (DE 22.) That order (which the Court has since converted into a preliminary injunction, *see* DE 43) prohibits Midwest, Neuman, Rosenberg, "their officers, agents, servants, employees, and attorneys, and all persons in active concert or participation with them" from

"ceasing operations" at the Mesa Hills Specialty Hospital and Midwest City Specialty Hospital "and any other facility that is subject to the Master Lease agreement." (DE 22 at 1-2.)

Despite the December 6, 2016 TRO, Midwest less than three days later announced that it had pressed ahead with its plans to suspend operations at the Mesa Hills and Midwest City Facilities. (DE 30 at 1.) Plaintiffs immediately sought a contempt order and renewed their request for appointment of a manager for the Facilities to address the TRO's violations. (DE 32.) The Court appointed Benchmark later that same day. (DE 34 at 2.) The Court appointed Benchmark to, among other things, "assist Midwest in maintaining and preserving the operation of the businesses . . . carry out all functions as manager [and] obtain full cooperation from Midwest related to operation of the [facilities]." (*Id*.) The Court also ordered Defendants "to provide such information and cooperation as are necessary for [Benchmark] to carry out such functions." (*Id*.) And the Court confirmed that "violations of that order" (that is, the order appointing Benchmark) "are punishable by contempt." (DE 42.)

### C. The Court's Opinion Denying Midwest's Motion To Compel CHOW

In response to the Court's appointment of Benchmark as manager for the facilities, Midwest moved, on emergency basis, to compel Plaintiffs to file CHOW applications with Texas and Oklahoma regulatory agencies, or alternatively, to expand the scope of Benchmark's appointment from manager to receiver, which would purportedly necessitate the filing of CHOW applications. (DE 40.) On January 18, 2017, the Court denied Midwest's motion, because Midwest had failed to show that Benchmark as manager had "acted beyond the terms that Midwest agreed to under the Master Lease" or "that appointment of a manager/consultant should be considered a change of ownership under Texas or Oklahoma law." (DE 63 at 11.)

### D.      Plaintiffs' and Benchmark's Procurement of New Operators

Benchmark and Plaintiffs have worked diligently to find new operators who can provide long-term stability of operations at the Facilities. (Decl. of N. Eingal, Appendix at A2 ¶ 3.) Plaintiffs have now found new operators for seven of the eight facilities and have entered into new leases with each of the new operators that will become effective after receipt of all applicable Regulatory Permits and agreements with applicable Payor Programs, whether by CHOW or otherwise, after filing applications for new Regulatory Permits or agreements with such Payor Programs. (*Id*. at A2-A3 ¶¶ 3-5.) And Plaintiff or each of these new operators, as applicable, is prepared to complete and submit the documentation necessary to obtain Regulatory Permits or Payor Agreements, thereby allowing the new operators to take over operations at the Facilities. (*Id*.) On June 23, 2017, Plaintiffs sent a notice letter to Defendants informing them of the new leases and new operators and requesting that Defendants provide full cooperation, as needed, to transfer operation of each of the Facilities to the new operators. (*Id*. at A3 ¶ 5, A5-A6.) To date, Defendants have refused to cooperate, necessitating this motion.

### ARGUMENT

Although the new operators are ready to take over operations at the Facilities from Midwest and Midwest's affiliated operators, and although the new operators have signed leases with Plaintiffs that are subject to receipt of applicable Regulatory Permits and Payor Agreements, Defendants have refused to cooperate and assist with maintaining operations at the Facilities and to transfer the Regulatory Permits and Payor Agreements. Defendants' refusal is in direct contravention with the terms of the Master Lease, the Court's prior orders, and Defendants' own prior position, which sought the very same goal Plaintiffs want to accomplish here—a CHOW to replace Midwest's operators with new operators.

Defendants have made clear that they have no interest in continuing to operate the Facilities. At the time Plaintiffs filed the Complaint in this case, Midwest had defaulted in payment of the rent, and then after this litigation had begun, Defendants filed two motions, which contradicted the Court's injunction, in an attempt to avoid their obligations to maintain operations and licensing at the facilities. (*See e.g.* DE 33 (Midwest's motion for immediate plan of discharge) and DE 40 (Midwest's emergency motion to compel CHOW).)

Under Section 22.3 of the Master Lease, Plaintiffs have the right to relet the Facilities subject to the Master Lease—without terminating the lease—following an event of default. (DE 1-1 Ex. A § 22.3.) Until that reletting has occurred or becomes effective, Sections 7.2(c) and 13.3 of the Master Lease require Midwest to "operate continuously" and "maintain" and "keep in good standing" all licenses and certificates of reimbursement as part of the normal operations of the Facilities. (*Id*. §§ 7.2(c), 13.1.) In addition, upon Defendants' default and appointment of a manager, Section 20.4 of the Master Lease specifically provides for Midwest to cooperate in a transition of operations to new operators (for example, by signing "operations transfer agreement[s]" with the new operators "installed in its place" should Plaintiffs demand execution of such agreements). (*Id.* § 20.4.)

The Court's prior orders impose similar obligations on Defendants. The Court's December 6, 2016 injunction, "RESTRAINED and ENJOINED" Defendants "from ceasing operations" at the Facilities subject to the Master Lease. (*See* DE 22 (TRO) (emphasis in original) and DE 43 (Order converting TRO to preliminary injunction).) The Court's December 12, 2016 order appointing Benchmark as manager also requires Defendants to cooperate with Benchmark to ensure operations at the Facilities are maintained and preserved. (DE 34 at 2.) In this way, the Master Lease and the Court's orders impose on Defendants a singular duty: to

maintain operations at the Facilities and cooperate in a process resulting in a change of operator. Thus, even though Defendants have been unwilling to operate the Facilities themselves, they should—at a minimum—meet their obligation to maintain and preserve operations by cooperating with Plaintiffs (and their appointed manager, Benchmark) to transfer the operations at the Facilities to new operators. Defendants should cooperate with Plaintiffs and Benchmark and any new operators for each of the Facilities to the extent state and federal regulatory agencies require participation by both the incoming and outgoing operators to complete the CHOW or other application process necessary to obtain or maintain all necessary Regulatory Permits and Payor Agreements.

Because the Facilities cannot continue to operate without the necessary Regulatory Permits and Payor Agreements, the refusal to cooperate with Plaintiffs, Benchmark, and the new operators in the CHOW or other application processes necessary to obtain or maintain Regulatory Permits and Payor Agreements violates the Master Lease and the Court's injunction. Defendants' refusal makes no sense at best, and is intentionally obstructive at worst, in light of the position they advocated with this Court six months ago.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court grant this motion and enter an order:

(a)  Requiring Defendants to cooperate, as necessary, with Plaintiffs, Benchmark, and the new operators to file and obtain approval from the state and federal regulatory agencies for appropriate Regulatory Permits and Payor Agreements for the Facilities subject to the Master Lease;

(b)  Requiring Defendants to promptly (*i.e.* within 48 hours of request) complete and submit any and all paperwork that an outgoing operator is required to complete as part of the

approval process necessary to transfer the Regulatory Permits and Payor Agreements to any new operators for the Facilities subject to the Master Lease;

(c)     Requiring Defendants to maintain, and renew if necessary and upon demand, any Regulatory Permits or Payor Agreements for all the Facilities subject to the Master Lease until new operators can transfer or obtain such Regulatory Permits and Payor Agreements; and

(d)     Requiring Defendants to, if necessary and upon demand, enter into an operations transfer agreement with the new operator for each of the facilities subject to the Master Lease under the same terms Defendants had when they entered into an operations transfer agreement with the operator that preceded them for each of the facilities in accordance with Defendants' obligations under Section 20.4 of the Master Lease.

Dated: June 26, 2017

/s/ David C. Giles
David C. Giles

John N. Scholnick
jscholnick@schiffhardin.com
David C. Giles
dgiles@schiffhardin.com
Mir Y. Ali
mali@schiffhardin.com
*(all admitted pro hac vice)*
SCHIFF HARDIN LLP
233 S. Wacker Dr., Suite 6600
Chicago, Illinois 60606
(312) 258-5500 (phone)
(312) 258-5600 (fax)

*Attorneys for Plaintiffs*

## **CERTIFICATE OF SERVICE**

    The undersigned attorney hereby certifies that on June 26, 2017, the foregoing was filed electronically with the Clerk of Court using the CM/ECF system, which constitutes service on all parties of record.

                                                            /s/     David C. Giles